**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| TERRY PETRE, Executor of | ) | Case No. 3:03CV7223 |
| the Estates of Wanda Petre, | ) | |
| Chelsey Petre, and Amber Petre, | ) | Magistrate Judge George J. Limbert |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| NORFOLK SOUTHERN | ) | |
| RAILWAY COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on the separate motions for summary judgment filed by

Defendants, Norfolk Southern Railway Co. (Norfolk Southern), and Florence Township, Ohio

(Township). *See* ECF Dkts. #96, #106.  The case is a wrongful death and survival action alleging

multiple counts of negligence against both Defendants. ECF Dkts. #1, #10.

Defendants are before the Court asserting that any alleged negligence on their part

cannot, as a matter of law, support a finding that the Railway or Township was the cause in fact,

or proximate cause, of the fatal accident that gave rise to this litigation. ECF Dkts. #96, #106,

#117, #119, #125.  The Township also asserts it is immune from liability in this suit. ECF Dkts.

#106, #125.

For the reasons set forth below, the Court GRANTS Summary Judgment as to all claims

alleged by Plaintiff against both Norfolk Southern Railway, and Florence Township, Ohio.

1

## I.    **FACTUAL AND PROCEDURAL BACKGROUND**

On a clear afternoon in July 2001,  Wanda Petre and her daughters, Chelsey and Amber (as well as Bradley Krontz, a cousin of the Petre's, and Chelsea Green, a family friend), were killed in a collision with Defendant's freight train at the Norfolk Southern Railway crossing on County Road I in Florence Township (Williams County), Ohio.

The railroad crossing was marked with standard black and white reflective crossbucks at the edge of the tracks, and an advanced warning disc (a standard reflective yellow "Railroad Crossing" sign) posted approximately 800 feet from the crossing. ECF Dkt. #108 (Attachment 4, OHSP Traffic Accident Report, at 16).  County Road I is a two-lane rural highway with a speed limit of 55 m.p.h.; there are no painted lines to mark the lanes of travel (i.e., no yellow center lines, and no white edge lines), and no pavement markings (i.e., "R x R" or 'stop bar') on approach to and at the Norfolk Southern crossing. *Id*. (Attachment 4 at 13, 17) and ECF Dkt. #120.

The driver, Wanda Petre, was a resident of Indiana, thereby unfamiliar with County Road I and the Norfolk Southern crossing. ECF Dkt. #108 (Attachment 2, Affidavit of Terry Petre). The Norfolk Southern train was traveling northbound at 61 m.p.h. (ECF Dkt. #96 at 14, n.6) and pulling 24 freight cars, all but one were loaded. ECF Dkt. #108 (Attachment 4 at 10, 13).  The locomotive was equipped with an Event Data Recorder and a video recorder ("RailView") that was mounted in the engineer's window; from this equipment, evidence of the train's speed, whistle activity, and braking activity, has been recorded. ECF Dkt. #99.[1]

---

[1]The reports from the Event Data recorder and the RailView video were authenticated during the Deposition of Mr. N. Adam Mastrangelo, an electrical engineer employed by Norfolk Southern Railway, Co., who assisted in the engineering and development of the RailView system.  ECF Dkt. #99 (Mastrangelo Deposition).

An eyewitness, Dennis Curry, observed the Petre vehicle traveling westbound towards the railroad crossing and witnessed the subsequent collision. ECF Dkt. #108 (Attachment 4 at 3 - 4).  Mr. Curry estimated that the Petre vehicle was traveling approximately 50 m.p.h. when he first noticed it, however, he did not watch the vehicle's entire approach to the railroad crossing, but indicated his attention was drawn back to that area when he heard an 'unusually long' train whistle. *Id.*  At that time, Mr. Curry saw the train collide with the Petre vehicle; he could not recall whether the vehicle's brake lights actuated. *Id.*

The multiple accident reconstruction and engineering experts that examined RailView appear to agree that the Petre vehicle had slowed to some extent in the final seconds before the collision, but the speed was not conclusively established (it is estimated to be somewhere in the range of 30 - 40 m.p.h. in the last four seconds of travel). ECF Dkt. #96 at 8.  RailView confirms that the train's whistle was sounding on approach to the intersection and at the time of the collision; also from this evidence, it is clear that Mrs. Petre's drivers-side window was rolled down. ECF Dkt. #110 (RailView).

RailView, and photographs taken at the scene by Ohio Highway Patrol investigating officers, evince several momentary view obstructions along County Road I, the last of which is located approximately 132 feet from the crossing. ECF Dkts. #108 at 6 (and Attachment 4), #110 (RailView).  These visual impediments (a farmhouse, several outbuildings, and several trees and bushes) are located on private property adjacent to, but not closely abutting, Norfolk Southern's right-of-way. ECF Dkts. #108 (Attachment 4), #110 (RailView).  Both parties' accident reconstruction experts appear to agree, to a reasonable degree of professional probability, that the moment the Petre vehicle passed the final visual obstacle, both Mrs. Petre, and the Norfolk

3

Southern crew, would have positively been able to see one another. ECF Dkts. #96 at 19, #108 at 8, #110 (RailView). Based on the distance and relative speeds involved, each had four seconds with which to react to one another's presence. *Id.* To a lay witness, and this Court, it does not appear that Mrs. Petre took any evasive action in those four seconds. *See e.g.*, ECF Dkt. #110 (RailView). Additionally, the Norfolk Southern crew did not appear to recognize the danger of this vehicle approaching the tracks until the second of impact. *Id.* All five of the vehicle's occupants perished at the scene of the collision.

Plaintiff's complaint was originally filed in Williams County Court of Common Pleas; it was removed to this Court by Norfolk Southern on May 7, 2003. ECF Dkt. #1. The Court's jurisdiction is proper based on removal jurisdiction for diversity of citizenship, per 28 U.S.C. §1441(b), as the Township was later added as a resident Defendant. *See e.g.*, ECF Dkt. #32. Additionally, the parties have consented to the jurisdiction of the undersigned Magistrate Judge. ECF Dkt. #56. In December 2004 this Court granted partial summary judgment to Norfolk Southern due to federal preemption of Plaintiff's State law claims attacking the sufficiency of the warning devices at the railroad crossing. ECF Dkt. #62.[2]

Plaintiff's remaining negligence allegations consist of the following: (1) that Norfolk Southern failed to maintain adequate sight distances / remedy visibility obstructions at or near the crossing (i.e., failed to maintain a safe crossing) (ECF Dkt. #10 at ¶¶34-39, ¶¶54-65); (2)

---

[2] 49 U.S.C. §20101 (Federal Railroad Safety Act, [FRSA]), 23 U.S.C. §130(a) Federal Railway-Highway Safety Act and the promulgated regulations of the Federal Highway Administration, effectuating the Federal Railway-Highway Crossings Program (23 C.F.R. §646.214(b)(3) and (4)) preempt all state-law claims challenging the adequacy of warning devices at crossings where federal funds have been expended to mark such crossings. The FRSA does contain a saving clause which permits States to 'adopt or continue in force a law, regulation, or order related to railroad safety' under certain circumstances (49 U.S.C. §20106). The U.S. Supreme Court has interpreted the saving clause to refer only to "specific, individual hazards" that are generally not capable of being addressed in the uniform, national regulations. *See e.g.*, *CSX Transportation v. Easterwood*, 507 U.S. 658 (1993); *Norfolk Southern Railway Co. v. Shanklin*, 529 U.S. 344 (2000). ECF Dkt #62.

failed to give an adequate audible warning of the train's approach (*Id*. at ¶¶24-33); (3) failed to maintain a proper lookout ahead on the tracks (*Id*. at ¶¶44-50); and, (4) failed to follow federally mandated track speed limits. *See e.g.,* ECF Dkts. #96, #108. #117. #118-1, #119.[3]  Plaintiff has also alleged that Norfolk Southern's customs, policies, and conduct involving all of the above allegations were willful, wanton, and demonstrated reckless disregard to the public. ECF Dkt. #108 at 8, 10.

Against Florence Township, Plaintiff alleges the Township failed to maintain adequate warnings on approach to the crossing (i.e., failed to paint lane lines, "R x R," and a stop bar on the pavement), and failed to maintain the pavement markings previously in place. ECF Dkts. #10, #106, #120, #125.

## II.    <u>STANDARD OF REVIEW</u>

Jurisdiction based upon diversity of citizenship requires this Court to apply Ohio's substantive law; the Court will apply the Federal Rules of Civil Procedure (FED. R. CIV. P. 56(C)) in deciding the standards for summary judgment. *See e.g.*, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  The function of summary judgment is to dispose of claims without trial when one party is unable to demonstrate the existence of a factual dispute which, if present, would require resolution by a jury or other trier of fact. *Schultz v. Newsweek, Inc.*, 668 F.2d 911, 918 (6th Cir. 1982).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C).

---

[3]Plaintiff has not objected to Defendants' summary of the remaining claims to be resolved, therefore the Court adopts this summary.

5

The party moving for summary judgment has the burden of showing there exists no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  This burden can be discharged by showing that the nonmoving party has failed to establish an essential element of his case, for which he bears the ultimate burden of proof at trial. *See e.g., Catrett v. Celotex Corp.*, 477 U.S. 317, 323 (1986); *Morales v. Am. Honda Motor Co., Inc.,* 71 F.3d 531, 535 (6th Cir. 1995).  The evidence and all the inferences that can reasonably be drawn therefrom must be read in the light most favorable to the nonmoving party. *Id.*

If the moving party meets his burden, the nonmoving party must take affirmative steps to avoid the entry of a summary judgment. *See* FED. R. CIV. P. 56(e).  To refute such a showing, the nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex*, 477 U.S. at 322.  A mere scintilla of evidence is not enough. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

In ruling on a motion for summary judgment, the court is not obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  Therefore, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of [the record] specifically called to its attention by the parties.' *Shultz v. Chrysler Corp.*, 1999 U.S. Dist. LEXIS 21798 (S.D. Ohio 1999) *aff'd.* 210 F.3d 372, 2000 U.S. App. LEXIS 6361 (6th Cir. 2000), *Staats v. United States*, 2001 U.S. Dist. LEXIS 14723 at * 8 (S.D. Ohio 2001).

**A.   Standard of Review for Negligence Claims**

Ohio law requires a plaintiff alleging negligence to establish that a genuine issue of

material fact exists as to the following elements: that the defendant owed a duty of care to the plaintiff, that the defendant breached that duty, and that the breach of duty was the cause in fact and proximate cause of injury to the plaintiff. *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006).  Primarily, Defendants have challenged Plaintiff's ability to present any significant, probative evidence to indicate that any of their alleged breaches of duty were the proximate cause of, or contributed to the cause of, the fatal collision at the County Road I crossing. *See e.g.*, ECF Dkts. #96, #106.

Proximate cause is generally established where an original act is wrongful or negligent and, in a natural and continuous sequence, produces a result that would not have taken place without the act. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287, 423 N.E.2d 467 (1981).  This requires more than merely showing that the defendant caused a condition that provided the opportunity for other causal agencies to act. *See e.g.*, *Herman v. Cattron, Inc*., 277 F. Supp.2d 774 (N.D. Ohio 2002), *aff'd.* 2004 U.S. App. LEXIS 6824 (6th Cir. 2004).  Further, the issue of proximate cause is usually a question of fact, however, if the plaintiff's evidence on the issue requires mere speculation or conjecture to determine the cause of the resulting injury, the defendant is entitled to summary judgment. *Nye v. CSX  Transp., Inc.*, 437 F.3d 556, 564 (6th Cir. 2006) (citing *Whiteleather v. Yosowitz*, 10 Ohio App.3d 272, 461 N.E.2d 1331 (Ct. App. 1983), *Renfro v. Ashley*, 167 Ohio St. 472, syllabus at 1, 150 N.E.2d 50 (1958)), and *see Cobb v. Bushey*, 152 Ohio St. 336, 346, 89 N.E.2d 466 (1949) (citing numerous cases referring to the plaintiff's burden to prove proximate cause – and if the plaintiff cannot support his allegations with evidence, the issue becomes one of law for the court to decide).

## III. LAW AND ANALYSIS

### A. Federal and State Railroad - Grade Crossing Regulations

In Ohio, and across this country, motorists and Railways owe mutual and reciprocal duties of care to one another upon approaching a crossing. *See e.g.*, *Day v. Norfolk Southern Corp.*, 1999 U.S. App. LEXIS 29272 at * 8 (6th Cir. 1999). For this reason, when undertaking to analyze the viability of tort claims arising from a collision at a railroad crossing, the court must consider the rights and liabilities of both the Railway and the motorist.

Generally, because the immutable laws of physics prove the inability to stop a train in a short distance, a Railway will not be held liable for a crash when a driver fails to effectively look and listen for a train upon approaching a crossing. Ohio has codified this rule by requiring a motorist to 'stop within 50 but not less than 15 feet from the nearest rail of a crossing when an approaching train is either emitting an audible signal, or is plainly visible and in close proximity to a crossing.' R.C. §4511.62; *Zuments v. Baltimore & Ohio Ry. Co.*, 27 Ohio St.2d 71, 72, 271 N.E.2d 813 (Ohio 1971), *Nye v. CSX Transp., Inc.*, 437 F.3d at 564 (motorists approaching a railroad crossing in Ohio owe a duty of care to avoid a collision). However, a train's right-of-way is not without limitation; the Railway owes a duty of care to protect the safety of motorists, and this duty in any given case is defined by the nature of the crossing at issue. *Day,* 1999 U.S. App. LEXIS 29272 at * 12 -13 (citing *Carpenter v. Consolidated Rail Corp.,* 69 Ohio St.3d 259, 631 N.E.2d 607 (Ohio 1994)).

Generally, the duty of ordinary care by a Railway is to place crossbuck signs at their crossings, to maintain safe conditions where the rails intersect the roadway by removing obstructions or impediments to safe crossing, to sound the locomotive's whistle and bells when

8

approaching a crossing, and to maintain a lookout ahead on the tracks and react appropriately to recognized or obvious hazards. *Wooten v. CSX Railroad*, 164 Ohio App.3d 428, 438-39 at ¶¶30-32, 842 N.E.2d 603 (Ct. App. 2005).  Although railroad crossings by their very nature are places of danger, State common law recognizes that certain crossings may be considered "extra-hazardous" and create circumstances where the general duty of ordinary care may be insufficient to protect the public. *See e.g.*, *Matkovich v. Penn Central Transp. Co.*, 69 Ohio St. 210, 431 N.E.2d 652 (Ohio 1982); *Hood v. New York, Chicago, & St. Louis R.R. Co.*, 166 Ohio St. 529, 114 N.E.2d 104 (Ohio 1957).

The law of "extra-hazardous" crossings considers the totality of the conditions at a railroad crossing and imposes liability if there is sufficient evidence of the "extra-hazardous" nature of a crossing.  If a crossing is "extra-hazardous" the Railway is found to have breached its duty of care to the public by failing to take additional precautions (mainly, by failing to install "active" warning devices such as protective gates and flashing lights). *See e.g.*, *Day v. Norfolk Southern Railway, Co.*, 1999 U.S. App. LEXIS 29272, *Gallaga v. Grand Trunk Western Railroad*, 1999 U.S. Dist. LEXIS 13416, Case No. 3:98CV7320 (N.D. Ohio 1999), *Hosteller v. Consolidated Rail Corp.*, 123 F.3d 387, 392-393 (6th Cir. 1997).  Ohio courts generally use the following test when deciding whether a crossing is an "extra-hazardous" crossing:  "whether there is a substantial risk that a driver in the exercise of ordinary care – that is, one who effectively looks and listens at a point where such action would determine the presence of a train – would be unable to avoid colliding with a train being operated over the particular crossing in compliance with statutory and commission regulations." *Hostetler*, 123 F.3d at 392 (citing *Hood*, 166 Ohio St. 529, *Matkovich*, 69 Ohio St. 210, and *Cates v. Consolidated Rail Corp.*, 100 Ohio

App. 3d 288, 653 N.E.2d 1229 (Ct. App. 1995)).

However, when federal funds are spent to equip the crossing with particular warning devices, the federal standards determine the "adequacy" of the warning devices employed; these federal standards preempt State common law claims that seek to impose additional duties upon a Railway. *See e.g.*, *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993); *Norfolk Southern Railway Co. v. Shanklin ("Shanklin I")*, 529 U.S. 344 (2000).   In other words, the federal standards preempt State "extra-hazardous" crossings claims. *See e.g.*, *Ludwig v. Norfolk Southern Railway Co.*, 50 Fed Appx. 743, 2002 U.S. App. LEXIS 23697 (6th Cir. 2002).

Although this Court has already determined that federal funds were used to place standard crossbuck signs at the County Road I - Norfolk Southern Railway crossing, Plaintiff in this matter continues to allege that the crossing was "extra-hazardous" by asserting that a number of factors combined to make the warnings inadequate and to prevent Mrs. Petre from having a reasonable opportunity to avoid the collision. ECF Dkt. #108 at 13.  Plaintiff's claims challenging the adequacy of the warning devices at the crossing are preempted as conflicting with the federal law on the same subject matter. *See e.g.*, *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658; *Norfolk Southern Railway Co. v. Shanklin ("Shanklin I")*, 529 U.S. 344.  "Once it is accepted that the regulations are not merely definitional, their scope is plain: they apply to any project where Federal-aid funds participate in the installation of warning devices." *Shanklin I*, 529 U.S. at 353-354.  Thus, the warning devices in place at the crossing improved with federal funds have, by definition, specifically found to be adequate under a regulation issued by the Secretary (of Transportation). *Id.* at 354.

The federal regulations governing the use of particular warning devices to be employed at railroad crossings are set out in 23 C.F.R. §646 *et seq*.; these regulations establish the Federal Railway-Highway Crossings Program pursuant to the Federal Railroad Safety Act (FRSA). *CSX Transportation, Inc. v. Easterwood*, 507 U.S. at 661-664.  The Supreme Court specifically held that 23 C.F.R. §646.214(b)(3) and (4) preempt State tort law because they displace state and private decision-making authority by establishing a federal standard of approval and adequacy for the protective devices installed at railroad crossings. *Id.* at 670.

It should also be noted that since preemption has been established, the Supreme Court has rejected a challenge that the authorities making the decisions (regarding whether a crossing will be equipped with "active" or "passive" traffic control devices) had not been fulfilling their obligations under the FRSA to make particular findings that the signs were adequate to protect safety.[4] *Shanklin I*, 529 U.S. at 356.  The Court has also rejected a claim against preemption that alleged that the crossing at issue presented several factors listed in §646.214(b)(3) (which defines the adequacy of the warning devices) and because the State's Department of Transportation (DOT) had not installed pavement markings as required by the regulations.[5] *Id.* The Court stated:

> This misconceives how preemption operates under these circumstances.  When the FHWA approves a crossing improvement project and the State installs the

---

[4]"Passive Warning Devices" are those types of traffic control devices located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train; "Active Warning Devices" are those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates, or similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train. *Easterwood,* 507 U.S. at 673, n.11 (citing 23 C.F.R. §646.204(I), (j)).

[5]For all projects in which federal funds have been expended to place warning devices at crossings, the FHWA's (Federal Highway Administration) Manual on Uniform Traffic Control Devices (MUTCD) sets the standards for which the devices must conform. *Easterwood,* 507 U.S. at 666 and n.7.

11

warning devices using federal funds, §§646.214(b)(3) and (4) establish a federal standard for adequacy of those devices that displaces State tort law addressing the same subject.  It is this displacement of State law concerning the device's adequacy, and not the State's or FHWA's adherence to the standards set out in §646.214(b)(3) and (4), or to the requirements of the MUTCD, that preempts State tort actions.

\*\*\*

[N]othing prevents a State from revisiting the adequacy of the devices installed using federal funds.  States are free to install more protective devices at such crossing with their own funds or with additional funding from the FHWA. *What States cannot do – once they have installed federally funded devices at a particular crossing – is hold the railroad responsible for the adequacy of those devices.*

*Shanklin I*, 529 U.S. at 357-358 (emphasis added).

On remand, the Sixth Circuit (*"Shanklin II"*) accepted the plaintiff's negligence claims alleging that the Railway had failed to clear obstructive vegetation from their right-of-way. *Shanklin v. Norfolk Southern Railway Co.*, 369 F.3d 978, 988 (6th Cir. 2004).  However, the Court particularly distinguished the *Shanklin* case from "extra hazardous" crossing cases, stating that Shanklin's claim was a "stand-alone vegetation claim," instead of a visual obstruction claim lumped together with a preemptable claim concerning the failure to provide adequate warning devices. *Id.* at 987-989.  The Sixth Circuit has also considered the FRSA saving clause as it relates to "extra-hazardous" crossings claims. *See e.g., supra* footnote 2 regarding the FRSA saving clause; *Ludwig v. Norfolk Southern Railway Co.*, 50 Fed Appx. 743 (6th Cir. 2002).  The plaintiff in Ludwig was attempting to use "extra-hazardous" crossing factors to assert that the crossing was excepted from federal preemption because it presented a "specific, individual hazard." *Id.* at 750.  After reviewing "specific, individual hazard" cases from other district courts, the Court noted that such a claim "relates uniquely to the avoidance of a single specific collision." *Id.* at 747-48 (citing *O'Bannon v. Union Pac. R. R. Co.*, 960 F. Supp. 1411 (W.D. Mo.

1997)).  A "specific, individual hazard" is not a general hazard common to all crossings – it cannot be one that is statewide in character, and cannot be capable of being addressed within uniform, national standards. *O'Bannon*, 960 F. Supp. at 1420-1421 (specific, individual hazards do not encompass claims of  inadequate warning devices, grade/angle of crossing, proximity to highway) *aff'd.* 169 F.3d 1088 (8th Cir. 1999); and *see e.g., Baker v. Canadian National/Illinois Central Railway Co.*, 397 F.Supp.2d 803, 813 (S.D. Miss. 2005) ("It has been consistently emphasized that the kinds of conditions that could constitute a 'specific, individual hazard' are limited to transient conditions that could lead to an imminent collision such as a child standing on the tracks or a motorist stranded on a crossing.").  It follows that once an "extra-hazardous" crossing claim is determined to be federally preempted, a plaintiff may not assert the same theory couched in terms of a "specific, individual hazard" exception to preemption.[6]

Finally, the most recent Ohio case dealing with the issue reviewed the *Easterwood* and *Shanklin* decisions and after determining that an "extra-hazardous" crossings claim was preempted by the federal regulations, that court went on to find that the photographic evidence of the case demonstrated that, "a vehicle could stop within 15 feet to the nearest rail, as mandated by R.C. §4511.62 and look down the tracks to see an approaching train." *Wooten v. CSX Railroad*, 164 Ohio App.3d 428, 440-441, ¶¶37, 39, 40 (Ct. App. 2005).  The *Wooten* court essentially used the same test (although not discussing the "extra-hazardous" nature of the crossing) to determine whether the motorist, when exercising ordinary care, could have avoided the collision by looking and listening at a point where such action would determine the presence of a train. *Id.*

---

[6] The County Road I - Norfolk Southern Railway crossing does not present hazardous characteristics of such a nature as would except the crossing from federal preemption under the saving clause of the FRSA.

Therefore, it appears that when determining the standard of care for a Railway in Ohio, the analysis of the case still includes the factors that may support an "extra-hazardous" crossings claim, since the Railway's duty (and / or the duty of the jurisdiction in control of the crossing) is ultimately "defined by the nature of the crossing" (i.e., the circumstances). *Matkovich v. Penn Central Trans. Co*., 69 Ohio St.2d 210.  For example, the court should still consider whether the crossing was so obstructed that a driver would have to proceed to the point of peril, dangerously close to the tracks in order to perceive an oncoming train, or that the warning devices were somehow obscured (e.g., obstructions on the Railway's or roadway's right-of-way creating a 'zone of danger' even though restricted sight distances are included in 23 C.F.R. §646.214(b)(3)). *See e.g.*, *Shanklin II*, 369 F.3d 978, *Wooten*, 164 Ohio App.3d 428.  However, this analysis is not undertaken using the heightened standard of care normally used in "extra-hazardous" crossings cases; it is simply that standard of care used in negligence law across this country - the duty to act as a reasonable person (or Railway) *under the circumstances*. Additionally, the determination of the Railway's duties to the motoring public continues to permit the assumption that the motorists who drive over the Railway's "right-of-way," will also exercise ordinary care in crossing. *Hood v. New York, Chicago & St. Louis R.R. Co.*, 166 Ohio St. at 535-36; *see e.g.*, *Day v. Norfolk Southern Railway, Co.*, 1999 U.S. App. LEXIS 29272.

## B.  Conditions at the Crossing

Norfolk Southern has set forth photographic evidence and substantive law to support their assertion that the conditions at the crossing were not the proximate cause of the collision and that many of Plaintiff's arguments are improperly asserted against them. ECF Dkt. #96. Plaintiff has alleged that several conditions at the crossing of County Road I and the Norfolk

Southern rails worked in conjunction to preclude Mrs. Petre from having a meaningful opportunity to perceive the oncoming train, and that Norfolk Southern's knowledge of these conditions invoked a duty on their part to act to prevent injury to motorists. *See e.g.*, ECF Dkts. #1, #10, #108 (refering to *Matkovich v. Penn Central Trans. Co.*, 69 Ohio St.2d 210).  Plaintiff specifies that buildings and vegetation along County Road I prevent an oncoming motorist from perceiving trains on Norfolk Southern's tracks, and that the absence of pavement markings indicating a railroad crossing, the severe angle of the railroad's intersection with County Road I, the elevation of the tracks above the roadway and the adjacent land, and the fact that Mrs. Petre was unfamiliar with the area, all worked to prejudice her ability to yield to an oncoming train.[7] ECF Dkt. #108 at 5 - 7.

Railways are required to remove obstructive vegetation at or near crossings, "upon its right-of-way at each intersection with a public road or highway, for a distance of 600 feet or a reasonably safe distance...as shall be determined by the Public Utilities Commission."[8]  R.C. §4955.36.  Additionally, R.C. §4955.20 requires railroad companies to "build and keep in repair[,] good and sufficient crossings over[,] or approaches to[,] such railroad, its tracks,...at all points where any public highway [intersects]." R.C. §4955.20.  However, according to

---

[7]Despite knowledge of federal preemption of this claim, Plaintiff states the crossing is "extra-hazardous" "because of the 23 C.F.R. §646.21(b)(3) factors, plus other facts including the hump [in the grade crossing], lighting, angle, greenery obstructions, making the traversing of it extremely difficult," and Plaintiff's railroad crossings / engineering expert "believes that even a person exercising ordinary care would not be able to avoid a collision at the crossing." ECF Dkt. #108 at 6, n.3 (citing Burnham Deposition at 19, 45-50).  Also, many of these same factors are considered in the design and engineering of the grade crossing, and were factors that were to be taken into consideration when the federally funded warning devices were installed; they are also factors that are "capable of national, uniform standards" and thus do not present "specific, individualized hazards." *See e.g.*, *Ludwig*, 50 Fed. Appx. at 747-48 (citing *O'Bannon*, 960 F. Supp. 1411).

[8]49 C.F.R. §213.37(b) also requires railroads to control vegetation upon their rights-of-way so that it does not obstruct the visibility of signs or signals.  This section does not preempt state law requiring railroads to maintain a clear sight distance. *Shanklin II,* 369 F.3d at 987.

R.C.§4955.22, a violation of R.C.§4955.20 results in liability to the government entity whose jurisdiction covers the land upon which the tracks are located. R.C. §4955.22.  In any event, the Norfolk Southern right-of-way extends for approximately 30 feet on each side of its rails and the line of sight down the tracks had been cleared to a distance of approximately 700 feet to the south (the quadrant at issue). ECF Dkt. #108 (Attachment 4 at 15).  Plaintiff has not set forth evidence of a violation of these sections of the Ohio Revised Code.

The photographs and RailView establish that none of the alleged visual (or alleged auditory) obstructions are on Norfolk Southern's right-of-way. ECF Dkt. #96, Dkt. #110 (RailView).  Norfolk Southern has no duty to remove visual obstructions outside of its right-of-way. *Wooten*, 164 Ohio App.3d at 441, ¶39 (citing *New York, Chicago & St. Louis R. Co. v. Kistler*, 66 Ohio St. 326, 342, 64 N.E.2d 130 (1902)).

To the extent that Mrs. Petre's view of the crossing or the northbound tracks was obscured by a private owner's home, outbuildings, and landscape, Plaintiff has not shown that the view was any more than momentarily interrupted by the landscape, or that Norfolk Southern had a duty, or even the ability, to address the problem of private property visual impediments. ECF Dkts. #96, #110 (RailView), #100 (Lt. Michael Sharp Deposition at 130), #101 (Trooper Anthony Brady Deposition at 126 - 127).  The accident reconstructionists concluded that Mrs. Petre had a clear view of the on-coming train for at least 4 seconds, and from a distance of at least 132 feet from the nearest rail (the OHSP Traffic Accident Report measurements confirm this distance).[9] ECF Dkt. #96 at 19.  This is of course distinct from Mrs. Petre's view of the

_____

[9] *See e.g.*, *Bickley v. Norfolk & Western Ry.*, 60 F. Supp.2d 732, 737 (N.D. Ohio 1998) (clear view from at least 85 feet from the tracks), *Cates v. Consolidated Rail Corp.*, 100 Ohio App.3d 288, 298, 653 N.E.2d 1229 (Ct. App. 1995) (clear view from at least 75 feet from the tracks); *Henson v. Norfolk Southern Corp.*, 1997 Ohio App. LEXIS 5951 at *15 (Ct. App. Dec. 15, 1997) (clear view from at least 110 feet from the tracks).

crossing itself which apparently was visible from a point of approximately 750 feet east of the rails (from the same direction from which Mrs. Petre was travelling). ECF Dkt. #106 at 9.

Passive warning devices indicate the presence of a railroad crossing – not the presence of an oncoming train; it is the motorists duty in exercising due care to respond appropriately to the warning devices in place.  The photographic evidence establishes that a motorist could stop within 50 feet to 15 feet of the nearest rail (as required by R.C. §4511.62) and see (southward) down the tracks for hundreds of feet.[10] *See e.g., Wooten*, 164 Ohio App.3d at 441, ¶40.  Also, in order for Norfolk Southern's acts or omissions to be the cause in fact and proximate cause of the collision, Plaintiff must offer some connection between the presence of the vegetative or other visual obstructions (that would be attributable to Norfolk Southern) and the occurrence of the collision.  To achieve even an inference that the elements of causation are satisfied, Plaintiff needs to show Mrs. Petre looked and listened for a train, at an area effective for those purposes, and that the vegetation obstructed her view.  The indisputable video evidence negates this inference.

Plaintiff also refers to an internal Norfolk Southern policy for the proposition that Norfolk Southern had an affirmative duty to contact the owners of the property where the house, outbuildings, trees and shrubbery were located, and request that the obstructions be removed, or offer assistance in causing their removal.[11] ECF Dkt. #108 at 13.  The language of the policy is precatory, it does not give Norfolk Southern the right or duty to alter the landscape of property

---

[10] A view 'up the tracks,' if stopped at 15 feet from the nearest rail, extends for a distance of approximately 1500 feet (with a similar view at 132 feet from the crossing). ECF Dkt. #98 (Burnham Deposition at 29-30).

[11] "If an obstruction is located off the right of way, the owners of the land containing the obstruction should be contacted personally, and an appeal made personally, to move the obstruction...If the land owner asks for assistance in removal of the obstruction, we should respond promptly and appropriately." (N&S Procedure 400.2) ECF Dkt. #108 at 13.

adjoining its right-of-way, nor has Plaintiff set forth evidence to establish that a breach of that policy is the proximate cause of the collision. *See e.g.*, *Osborne v. Norfolk & Western Ry. Co.*, 68 Ohio App.3d 85, 90, 587 N.E.2d 433 (1990) (operating rules containing language that is "merely directory" should not be considered as evidence of a railroad company's negligence). The substantive law of Ohio does not appear to recognize negligence liability based on such policies (and Plaintiff has not provided the Court with any information that may suggest otherwise), therefore the Court declines to create a legal duty based upon this Norfolk Southern internal operating policy.

### C.  Failure to Properly Activate the Locomotive Whistle

Plaintiff alleges Norfolk Southern is negligent per se[12] based on violations of R.C. §4955.32 and R.C. §4999.04 which set forth the audible warning requirements for locomotives approaching a crossing. ECF Dkts. #1, #10.  Norfolk Southern relies on RailView, as it conclusively establishes that the train's whistle was blowing upon its approach to the intersection and at the time of the collision. ECF Dkts. #96, #110 (RailView).  The parties do not dispute the whistle's compliance with federal audibility requirements. ECF Dkt. #96 at 16, n.7.  Plaintiff has responded to Norfolk Southern's motion by asserting that the violations are negligence per se, 'and the only remaining question is whether such negligence was a proximate cause of the crash - which should only be determined by a jury.' ECF Dkt. #108 at 17 - 18, 22.

---

[12]The violation of a statute enacted for the protection of the public is negligence per se, or 'negligence as a matter of law.' *Skinner v. Pennsylvania R. Co.*, 127 Ohio St. 69, 186 N.E. 722 (Ohio 1933).  This however, does not negate the need to establish causation / proximate cause. *Id.* at 72; *and see Cobb v. Bushey*, 152 Ohio St. at 346.

A locomotive approaching a railroad crossing "shall sound such whistle at a distance of at least 80 and not further than 100 rods[13] from such crossing and ring such bell continuously until the engine passes the crossing." R.C. §4955.32(B)(1).  The statute does not make the Railway a guarantor of the whistle's effectiveness; if the whistle is blown as the statute mandates, it is presumed to have been heard. *See e.g.*, *Bauer v. CSX Transp., Inc.*, 1999 U.S. Dist. LEXIS 21175 at * 4 - 5.

As a general matter, there is a sign posted along the tracks to notify a train's crew of an approaching crossing (a "whistle post") and the need to begin sounding the whistle.  RailView establishes, and the parties do not dispute, that the whistle was blown approximately 3 seconds after the front of the locomotive passed the whistle post. ECF Dkt. #96 at 15.  Plaintiff submits that the late whistle resulted in the train traveling "300 feet closer to the crossing in silence." ECF Dkt. #108 at 7 - 9.  Plaintiff, however, has not pointed to evidence of the location of the whistle post in order to establish a violation of R.C. §4955.32 (i.e., if the whistle post was located 1620 feet from the crossing, then mathematically the delay of 300 feet is still within the distance required by the statute).   In any event, viewing all evidence in the light most favorable to the plaintiff, and presuming <u>without deciding</u>, that R.C. §4955.32 was violated, Plaintiff has still failed to set forth evidence that would present a genuine issue of material fact that the delayed whistle was the proximate cause of the collision.   "For a railroad's violation of a safety statute to have been the proximate cause of an accident it must be shown that the accident would not have occurred if the railroad had met its obligations."  79 Oh. Jur., Railroads §287 (2005)

---

[13]80 to 100 rods = 1320 to 1620 feet. *Sheets v. Norfolk Southern Corp.*,109 Ohio App.3d 278, 293, 671 N.E.2d 1364 (Ct. App. 1996).

(citing *Glinsey v. Baltimore & Oh. R. Co.*, 495 F.2d 565 (6th Cir. 1974) (applying Ohio law).

The issue is analogous to that in *Henson v. Norfolk Southern Corp*., where an Ohio appeals court found evidence of a violation of R.C. §4955.32 based on the location of the whistle post, yet reasoned that no jury could possibly find that the statutory violation was the proximate cause of the accident. *Henson v. Norfolk Southern Corp*., 1997 Ohio App. LEXIS 5951, Case No. 97 CAE-05-016 (Ct. App. December 15, 1997).  Here, the whistle began sounding approximately 12 seconds prior to the collision.  It is illogical to conclude that the 3-second delay in sounding the whistle prejudiced Mrs. Petre's ability to hear the whistle (when it would have been much further from the crossing), since she did not appear to hear the whistle when the train was upon her. ECF Dkt. #110 (RailView).  Thus, any alleged violation of R.C. §4955.32 was not the proximate cause of this collision.

Next, Plaintiff alleges that Norfolk Southern violated R.C. §4999.04, which requires a train's engineer to "sound the locomotive whistle at frequent intervals, beginning no less than 1320 feet from such crossing and continuing until the locomotive has passed the crossing." R.C. §4999.04(A)(2), ECF Dkt. #108 at 8.  As noted above, RailView indicates that the whistle began sounding approximately 12 seconds prior to the collision, however the evidence varies as to whether the whistle was sounded 2, 3, or 4 times. ECF Dkts. #108 at 9 - 10, n.8, #99 (Mastrangelo Deposition at 106 - 109), #108 (Attachment 4 at 3 - 4).  Although the evidence is conflicting as to the "frequent intervals" requirement, Plaintiff's theory is that the whistle sounded only twice. ECF Dkt. #108 at 9 - 10.

The Court finds that the frequency of whistle's use is not a genuine issue, nor a material dispute for purposes of determining liability.  Specifically, the Court finds it would be

20

unreasonable to permit a jury to deliberate upon the issue of how many whistle bursts are required to meet the "frequent intervals" requirement of R.C. §4999.04,  and the policy prohibiting juror speculation on the issue outweighs any doubt as to the materiality of the issue. Further, a ruling on this matter would amount to a legal determination that certain 'sequences' are inadequate, thereby subjecting Railways to additional liability for factors that likely cannot be controlled when faced with an emergency.  Clarification of the statute's "frequent intervals" requirement and / or extending the distance of the whistle post, is best left to the Ohio General Assembly.

Additionally, although Plaintiff presents testimony from his experts on the industry standards ("long, long, short, long" whistle bursts) and of an "emergency sequence" of short whistle bursts, Plaintiff has not set forth evidence indicating that Mrs. Petre did not hear the train's whistle because it was not blown in the above described sequences.[14]  To the contrary, Plaintiff's audiology expert, Dr. David Lipscomb, stated that based on the volume of the whistle, Mrs. Petre would have been able to hear the whistle had it been sounded at the whistle post. ECF Dkt. #108 (Attachment 7).  Although Plaintiff attempts to explain the difference between Dr. Lipscomb's "alerting" versus "detecting" distinction, the logical conclusion is that, if Mrs. Petre had the ability to hear the whistle, then the frequency of whistle bursts would not have changed the fact that she disregarded the sounding whistle.

Plaintiff has not set forth evidence from which a reasonable jury could conclude that, but for the late whistle or the infrequency of the whistle's use, this collision would not have

---

[14]Citing Norfolk Southern internal policy and procedure: NS 14: 'requiring "long, long, short, long" pattern and requiring short bursts to alarm those on or near the track.' ECF Dkt. #108 at 12; the Court was not provided the full text of these rules.

occurred.  Nor could these allegations be said to constitute a substantial factor in causing or attributing to the cause of the collision.

### D.  **Failure to Follow Federal Track - Speed Regulations**

Federal rule 49 C.F.R. §213.9 mandates a 60 m.p.h. speed limit based on the class of the tracks at the County Road I - Norfolk Southern crossing. ECF Dkt. #108 at 12.  The Norfolk Southern train was traveling 61 m.p.h. at the time of the collision.[15]  ECF Dkt. #96 at 14, n.6. Plaintiff alleges that the speeding train deprived both the crew and Mrs. Petre of "precious moments in which to react to a developing situation." ECF Dkt. #108 at 20.  Norfolk Southern has challenged Plaintiff's allegations that this speeding violation, even if deemed negligence per se, was the cause of this collision. ECF Dkt. #96.

Plaintiff's accident reconstructionist, Dr. J. Larry Williams, opined that, had the train been traveling 60 m.p.h. for 1175 feet on approach to the intersection ('the distance in which the crew's duty to the public arises'), that Mrs. Petre would have been afforded two-tenths of a second, or an additional 12 feet to clear the intersection. ECF Dkt. #96 at 19.  Defendant asserts that any difference in the time of "arrival at the crossing" caused by the train's speeding, when expressed only in terms of the fractions of a second, could not reasonably be found to have caused the collision. ECF Dkt. #96.  Defendant points to Dr. Williams' conclusion that Mrs. Petre was not prejudiced in her ability to perceive or react to the train by any fraction of a second. ECF Dkt. #96 at 19 - 21.

Plaintiff has countered with Dr. Raymond Brach's analysis of the collision; Dr. Brach is the defense's accident reconstructionist who provided a frame-by-frame reenactment of the

---

[15]The parties have not addressed federal preemption of a common law negligence claim by the federal rule (49 C.F.R. §213.9) because the train was traveling over the prescribed speed limit.

collision based upon RailView.  Dr. Brach determined that Mrs. Petre attempted two evasive maneuvers in the final seconds prior to the collision. ECF Dkt. #108 at 6.  "First, she sped up her car to get across the tracks, then attempted to slam on the brakes in an attempt to stop (apparently upon the realization that she would be unable to clear the crossing before the train)." ECF Dkt. #108 at 6 - 7.  'Dr. Brach concluded that, had the train been traveling at or below the speed limit (from the whistle post to the crossing), Mrs. Petre would have had at least 20 feet longer to perceive the train prior to the collision.' ECF Dkts. #108 at 20-21, #118 at 7.  Plaintiff further states, 'Dr. Brach testified [that]...a mere twenty extra feet would have provided Mrs. Petre with a better opportunity to react that could very well have led to a different result, namely no collision.' *Id.*  A closer reading of the record indicates that the 20 feet 'extra' clearance distance that would have been achieved by a reduction in the train's speed, is the result of a hypothetical question posed by Plaintiff's attorney in an attempt to determine the "reasonableness" of Mrs. Petre's decision to momentarily 'speed up' shortly before reaching the intersection.[16] ECF Dkt. #114 (Brach Deposition at 103 - 115).

The Court finds the conflict about the train's speed and the "arrival at the crossing theory" is without merit and based upon pure conjecture.  Dr. Williams' estimations begin with an arbitrary measure of 1175 feet and he fails to support his reasoning with a foundation other than of speculation and fails to consider the effects of the automobile's speed differentials on the

---

[16]The Court has observed more than one instance of misrepresented or distorted 'facts' and counsel has repeatedly failed to provide this Court with citations to the record, or substantive law, that may support the genuineness or materiality of the issues presented.  It is not the responsibility of this Court to search through such mire and examine the voluminous record filed in this matter to find whether any fact exists which may create a genuine and material dispute for a jury to deliberate upon. *See e.g.*, *Interroyal Corp. v. Sponseller*, 889 F.2d. 108, 111 (6th Cir. 1989) (the court is not obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim).

"arrival at the crossing."[17]   None of the experts consulted could increase what Plaintiff asserts to be "precious moments of extra time" that could have been created, but for the speeding violation, to more than a fraction of a second.  It is simply pure speculation as to whether a fraction of a second would have, or could have, spared the parties from this collision or lessened its tragic result. *See e.g., Carpenter v. Norfolk & W. Ry.*, 1998 U.S. App. LEXIS 7694 at *10-11 (summary judgment based upon insufficient evidence of proximate cause where train collided with a vehicle 0.2 seconds sooner than it would have if the train had been traveling at the legal speed limit of 60 m.p.h. for that same time).

The case is analogous to *Hotchkiss v. National Railroad Passenger Corp.*,  where the plaintiff alleged that the excessive speed caused the accident 'because had the train been traveling 8-10 m.p.h. slower it would have arrived at the intersection a second later than it actually did, allowing the [vehicle] to safely cross.' *Hotchkiss v. National Railroad Passenger Corp.*, 904 F.2d 36, 1990 U.S. App. LEXIS 8694 at * 18 (6th Cir. 1990).  The Sixth Circuit Court, applying Michigan law held that such evidence is insufficient to establish proximate cause: 'Speed is not causal merely because the train arrived at the crossing the instant it did, while if it had been going slower the [vehicle] might have safely crossed in front of it.' *Id.* at *22 - 23.  While the Court was able to apply Michigan law on point to the analysis, the Court still concluded, based upon common law tort principles, that the theory was irrelevant because a jury

---

[17]The Court regards the distance of 1175 feet as an arbitrary measurement because although Dr. Williams opined that he determined this measurement from the point at which the crew's duty to the public arises, he further opined that he believes that the duty begins at the whistle post. ECF Dkt. #104 (Williams Deposition at 26); further Plaintiff states that from the whistle post to the crossing is "where the horn duty provides a minimum of time for the driver to hear, see and react to the train." ECF #Dkt. 108 at 20.  Because R.C. §4955.32 establishes that the whistle post should be located somewhere in the range of 1320-1620 feet, the Court is unable to find the logic behind the 1175 feet measurement, and Plaintiff has not pointed this Court to evidence that may explain this measure.

cannot be permitted to speculate as to causation. *Id.* at * 25.

This Court has not undertaken to weigh evidence presented, or to judge the credibility of the witnesses, however the Court must note Dr. Brach's conclusion, when he was asked to consider the above evidence. Dr. Brach stated, "the uncertainty [in this case] is going to knock out any attempt to say that '[O]h, if the car, or if the train, had gotten to the crossing eight-tenths of a second later, the accident wouldn't have occurred.' That's foolhardy." ECF Dkt. #114 (Brach Deposition at 106). In other words, Plaintiff has not pointed this Court to sufficient, probative evidence from the record, to create a genuine issue of material fact that, but for the train's speeding, the collision would not have occurred. Nor is there evidence from which an inference would arise that the train's traveling 1 m.p.h. in excess of the track's speed limit was a substantial factor in causing or attributing to the cause of the collision.

### E. <u>Failure to Maintain a Proper Lookout</u>

It is the duty of the train's engineer to keep a lookout on the track ahead of the train, and 'if while doing so, his eye takes in a person approaching the track, he may assume that such person will keep away from the track until the train passes, but when it becomes evident that such person will not keep off the track, it becomes the duty of such engineer to use ordinary care to prevent injury to that person.' *Nye v. CSX Transp.* Inc., 437 F.3d at 557 (citing *Cates v. Consolidated Rail Corp.*, 100 Ohio App.3d 288, 653 N.E.2d 1229, 1237 (Ct. App. 1995), quoting *New York, Chicago & St. Louis R.R.Co. v. Kistler*, 66 Ohio St. 326, 331 syllabus at 6, 64 N.E. 130 (1902)). 'Once a motorist enters a grade crossing, the train crew is under a duty of ordinary care to do everything reasonably possible to stop the train; however, the crew is entitled to presume that oncoming cars will exercise ordinary care for their safety and stop before the

tracks.' *Gallaga*, 1999 U.S. Dist. LEXIS 13416 at *12.  "Under this reasoning, it becomes apparent that the crew's duty is not activated until the approaching car enters the crossing."[18] *Id.*

Defendant states that the engineer was fulfilling his duty of maintaining a lookout ahead of the tracks and that the time available for the train's crew to respond to the approaching vehicle was insufficient to have prevented the accident. ECF Dkt. #96.  Plaintiff challenges Norfolk Southern's motion first by attacking the credibility of the train's crew (which this Court will not address as it is irrelevant for purposes of summary judgment); second, yet most significantly, Plaintiff does not allege that the crew would have been able to slow or stop the train in order to prevent or mitigate the collision.  Instead, Plaintiff alleges that, but for the failure of the crew to maintain a proper lookout, the crew would have recognized that the view of the approaching train would be obstructed, which would have led them to sound an "emergency whistle sequence," which "provides a better chance for the warning to reach the driver . . . and communicates the existence of an emergency," thereby providing Mrs. Petre with a meaningful opportunity to avoid the collision.[19] ECF Dkt. #108 at 18 - 19.

However, there is no evidence that the Petre vehicle came into the crew's sights at a point sufficiently distant to have made it possible for them to react as Plaintiff suggests.  As previously discussed, it appears to be agreed that neither Mrs. Petre nor the train's crew had an absolute and

---

[18]Also, the duty to keep a lookout does not go so far as to require keeping a constant lookout when it would be inconsistent with the crews' other duties. *See e.g.*, 79 Oh. Jur., Railroads §328 (citing *Wheeling & L.E. Parker*, 19 Ohio C.D.1, 1906 WL 656 (Ohio Cir. Ct. 1906). While this is not binding authority on this Court it is persuasive when attempting to determine how Ohio courts would address the same issue under the facts presented here.

[19]In other words, Plaintiff does not appear to assert that the circumstances surrounding the collision (i.e., 'unwavering approach' of the vehicle) created a "specific, individual hazard." *See e.g.*, *Beal v. National Railroad Passenger Corp.*, 2006 U.S. Dist. LEXIS 51963 at *10, Case No. 2:04CV250 (N.D. Ind. 2006) (citing cases with similar theories).

clear opportunity to view one another until approximately 4 seconds before the collision.  Given that Plaintiff alleges that the failure to keep a lookout ahead resulted only in the absence of the sounding of an "emergency whistle sequence," and that the lack of sounding an "emergency whistle sequence" is not a breach of any known or recognized common law or statutory duty which would result in a finding of misfeasance, Plaintiff's theory here is too attenuated to establish causation.[20]

Plaintiff also alleges that the conductor and engineer, "conspired to cover up their own negligent, willful, and wanton misconduct." ECF Dkt. #108 at 8.  Plaintiff refers to the deposition testimony of the Norfolk Southern crew (conductor Mickey Wilson, and engineer Eric Watkins) and the conduct of supervisors at Norfolk Southern charged with investigating this collision that indicates the crew was not paying attention while approaching the crossing and that supervisors had knowledge of this misfeasance and failed to address it in their reports. ECF Dkt. #108 at 8, 10.

"Wanton misconduct is such conduct as manifests a disposition to perversity and it must be under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be conscious, from his knowledge of surrounding circumstances and existing conditions, that the conduct will in all common probability result in injury." *Bailey v. Brown*, 34 Ohio St.2d 62, 66, 295 N.E.2d 672 (1973).  One acts wantonly when there is a complete failure

---

[20]Plaintiff has not pointed this Court to any State or federal statute requiring an "emergency whistle sequence," nor was the Court able to locate any law to support Plaintiff's theory on this issue.  Additionally, as discussed in Section C of this Opinion, *supra* at 19 - 22, the frequency or infrequency of the whistle's use did not cause or contribute to the cause of this collision.  Plaintiff has not presented sufficient evidence that would support an inference that (even though the whistle was being blown on approach and at the time of the collision)a different sequence of the whistle's use would have acted to  mitigate or avert this collision.

Finally,  the facts presented here are distinguishable from those in *Henson v. Norfolk Southern Corp.*, as there is nothing to support an inference that "the engineer, in the exercise of ordinary care, could have slowed the train sufficiently to turn this accident from a fatality to a near miss."  *Henson*, 1997 Ohio App. LEXIS 5951 at *11.

to exercise any care whatsoever. *Matkovich*, 69 Ohio St.2d at 212, 214.

Plaintiff's references to the above allegations do not satisfy the standards necessary to establish willful and wanton misconduct by Norfolk Southern. The evidence shows that the whistle and bell were sounding, the lights were activated, there was adequate signage to warn of a railroad crossing, and the Norfolk Southern right-of-way was free of obstructions – this does not indicate a complete lack of care. *See e.g.*, *Snow v. Norfolk & Western Railway*, 723 F.2d 911 (6th Cir. 1983). Also, Plaintiff has not presented evidence that this conduct factored into causing the collision.

Additionally, Plaintiff sets forth a sub-issue alleging the crew's negligence based on the engineer's failure to supervise the conductor's activity. ECF Dkt. #108 at 8. Plaintiff states that Norfolk Southern policies create a duty upon the engineer to correct the conductor's negligent behavior in late whistle-blowing (i.e., missing the whistle posts), sounding improper whistle sequences, speeding, and violating the internal rules of Norfolk Southern. *Id.* Plaintiff has set forth no evidence to establish that the internal policies of Norfolk Southern created a duty owed to Mrs. Petre, nor that the breach of such a duty was the proximate cause of this collision. ECF Dkt. #117 at 3 - 4.

### F. Negligence Allegations Against Florence Township, Ohio

Plaintiff alleges that the Township failed to adequately mark or maintain the markings on County Road I near the Norfolk Southern crossing. ECF Dkt. #10. Plaintiff states that the Ohio Manual on Uniform Traffic Control Devices (OMUTCD) requires advanced warning signs in the form of "R x R" pavement markings at all crossings where the speed limit of the roadway is greater than 40 m.p.h.. ECF Dkt. #120 at 6, 10. Plaintiff presented evidence that the markings

were previously on the roadway, which the Township does not challenge, however the Township

provides evidence that the roadway was last resurfaced in 1992 and since that time the roadway

has remained unmarked.[21] ECF Dkts. #125, #126.  The Township has challenged Plaintiff's case

on several theories but the determinative matters are the Township's immunity from suit and the

insufficiency of evidence to establish a nuisance condition resulting from the absence of the

pavement markings.

### (I)  R.C. Chapter 2744 Political Subdivision Tort Liability Act

The process for determining political subdivision immunity under Chapter 2744 of the

Ohio Revised Code consists of a three-tiered analysis: first, the court must determine if immunity

is applicable to the cause of action (R.C. §2744.02(A)(1)), then determine if there are any

exceptions to that immunity (R.C. §2744.02(B)), and if excepted, whether the "immunity can be

reinstated if the [township] can successfully argue that one of the defenses contained in R.C.

§2744.03 applies." *Cater v. Cleveland*, 83 Ohio St.3d 24, 28, 697 N.E.2d 610 (1998).

R.C. §2744.02(A)(1) states, "[e]xcept as provided in division (B) of this section, a

political subdivision is not liable in damages in a civil action for injury, death, or loss to person

or property allegedly caused by an act or omission of the [township] in connection with a

governmental or proprietary function." R.C. §2744.02(A)(1).  A  "government function" is

defined to include the following pertaining to the case at bar:

> (e) the regulation of the use of, and the maintenance and repair of roads...;

> (j) the...erection or nonerection of traffic signs, signals, or control devices;

---

[21]The Township has also presented an affidavit to the effect that they have no equipment with which to maintain their roadways, and that Williams County contracts to do such work which includes painting markings on the roadway.  See ECF Dkts. #106, #125.

(l) the...design, construction, or reconstruction of a public improvement... .

R.C. §2744.01(C)(2)(e), (j), (l).

Once immunity is established, the court must consider whether any of the exceptions to immunity exist under subsection (B), which contains five exceptions to the immunity created in the statute. R.C. §2744.02(B).  Plaintiff and the Township discuss R.C. §2744.02(B)(3), which relates to roadways and the maintenance of a nuisance condition, as a possible exception to the Township's immunity.  At the time of the accident, the language of this subsection provided that the Township is liable for negligent failure to keep public roads, highways and streets within the Township open, in repair, and free from nuisance.[22] ECF Dkt. #106 at 6.  Also, in response to Plaintiff's argument that the OMUTCD requires pavement markings thereby creating a duty on the part of the Township to follow OMUTCD mandates, the Township refers to R.C. §2744.02(B)(5).  That section states that a political subdivision is liable for injury, death, or loss to a person or property *when civil liability is expressly imposed* upon the political subdivision by a section of the Ohio Revised Code. R.C. §2744.02(B)(5) (emphasis added).

By definition, Florence Township is a political subdivision, entitled to immunity under Chapter 2744 of the Ohio Revised Code.  Therefore, in order for the Township to be stripped of this immunity Plaintiff must establish that the Township negligently failed to keep County Road I free from nuisance (R.C. §2744.02(B)(3)) or that a particular section of the Ohio Revised Code

---

[22] The current version of the statute has deleted the "nuisance" language and replaced it with "and other negligent failure to remove obstructions from public roads." *See e.g.*, ECF Dkt. #106 at 6. "Nuisance" is defined by the Ohio courts as: "[a] permanent obstruction to visibility, within the highway right-of-way, which renders the regularly traveled portions of the highway unsafe for the usual and ordinary course of travel." *Manufacturer's National Bank of Detroit v. Erie County Road Comm.*, 63 Ohio St.3d 318 at ¶1 of the syllabus, 587 N.E.2d 819 (Ohio 1992).

expressly imposes liability on the Township for failing to paint advance warnings on the roadway near railroad crossings (R.C. §2744.02(B)(5)).

### (ii) Relevant Exceptions to Political Subdivision Immunity from suit

Plaintiff asserts that the condition of the roadway, without pavement markings (and in conjunction with other circumstances), created a nuisance condition because, had the marking been in place, 'Mrs. Petre would have had a far better chance of safely navigating this exceedingly dangerous crossing.' ECF Dkt. #120 at 2 - 3.  Plaintiff also asserts that the OMUTCD, as adopted by the Ohio Revised Code, statutorily requires these markings. ECF Dkt. #120.  Plaintiff also states that since the pavement markings were on the roadway some 6 to 9 years prior to the collision the Township had a duty to maintain the markings.[23]*Id.*

Contrary to Plaintiff's contentions, the mandates of the OMUTCD and R.C. §§4511.09, 4511.11 do not expressly impose liability on a political subdivision for failing to follow their requirements.  When a party seeks to hold a government entity liable under Chapter 2744, the statutory law that the plaintiff relies upon in setting the standard of care must affirmatively and expressly impose liability on a political subdivision within the meaning of Chapter 2744. *See e.g., Butler v. Jordan*, 92 Ohio St.3d 354 (Ohio 2001); *Marshall v. Montgomery County C.S.B.*, 92 Ohio St.3d 348 (Ohio 2001).  'Clearly there is a responsibility to conform to the OMUTCD per R.C. §4511.11, however that section does not expressly impose liability for its violation upon a political subdivision for failure to paint warnings on pavement in advance of railroad crossings.' *Scanlan v. Consolidated Rail Corp.*, 1990 Ohio App. LEXIS 1442 at * 9 - 10 (Ct.

---

[23]The roadway is reported to have been marked up until 1997 (ECF Dkt. #120) however the Township asserts the roadway was resurfaced in 1992 and was not marked after that resurfacing project. ECF Dkts. #125, #126.

App. 1990); *Mitchell v. Conrail*, 1991 Ohio App. LEXIS 3716 at * 4 -  5 (Ct. App. 1991) (No section of the Revised Code expressly imposes liability upon a political subdivision for its failure to erect a railroad crossing ahead sign –  while there may be responsibility imposed, there is no corresponding liability for failure to comply with the Manual.).  Therefore, Plaintiff must rely on the nuisance theory (the exception under R.C. §2744.02(B)(3)) to except the Township from governmental immunity.

To establish a nuisance condition Plaintiff must show that a condition existing within the Township's control created a danger for ordinary traffic on the regularly traveled portion of the road and that the cause of the condition was other than a decision regarding design and construction. *See e.g.*, *Stern v. City of Steubenville*, 137 Fed. Appx. 820, 824, 2005 U.S. App. LEXIS 12606 (6th Cir. 2005) (citing *Haynes v. City of Franklin*, 95 Ohio St.3d 344, 767 N.E.2d 1146 (Ohio 2002)).  If the condition complained of is determined to be a nuisance it must also be shown that the political subdivision had knowledge of the nuisance. *Id.*

The Township asserts that County Road I was last resurfaced in 1992 by the Williams County Engineer, and that after the resurfacing the County did not paint any markings on County Road I. ECF Dkts. #125, #126 at 2.  The Township states that since the road markings were not "installed" during the resurfacing project, they had no markings to maintain. *Id.*

Plaintiff has set forth nothing but conclusions in an attempt to establish that the lack of pavement markings on County Road I rendered that roadway "unsafe for the usual and ordinary course of travel." *Manufacturer's National Bank of Detroit v. Erie County Road Comm*., 63 Ohio St.3d 318 at ¶1 of the syllabus, 587 N.E.2d 819 (Ohio 1992).  This is not a situation analogous to that in *Franks v. Lopez*, on which Plaintiff relies, to assert the position that, "signs

32

that have lost their capacity to reflect" may be considered a nuisance. *Franks v. Lopez*, 69 Ohio

St.3d 345, 349, 632 N.E.2d 502 (Ohio 1994); ECF Dkt. #120 at 7.  Nor is this a situation

involving a 'pavement marking so worn away or obliterated that it is not visible and is inherently

in a state of disrepair.' ECF Dkt. #120 at 7.  There were simply <u>no</u> markings on the road for

approximately 9 years prior to the crash – and Plaintiff has not presented any evidence that the

roadway was somehow made dangerous during those 9 years.

Plaintiff simply asserts that the absence of the markings creates a potential danger, that

they <u>would have</u> or <u>could have</u> improved the safety of the crossing and that because the markings

were not on the roadway, Mrs. Petre was not prepared to navigate the crossing and was not

sufficiently warned that a train might be present.[24] ECF Dkt. #120 at 9, 11-13.  Additionally,

Plaintiff relies on his expert's statements that motorists simply become accustomed to traffic

signs and that many signs are "often be overlooked as one of the hundreds of signs a motorist

passes routinely in their travel." ECF Dkt. #120 at 14 (citing Burnham Deposition at 71).  From

this Plaintiff concludes that signs must be reinforced with other markings, or even more signs,

and that 'a reasonable jury could find that the smaller yellow sign (i.e., the advanced warning

disc), without the advance warning "R x R" pavement markings, did not adequately warn Mrs.

Petre that she should be looking for a train.' *Id.*

The signs (i.e., advanced warning disc and crossbucks) warn of a railroad crossing, not

the presence of oncoming trains.  The injury to the Plaintiff is the collision and its tragic results,

---

[24]The parties have not addressed the possibility to federal preemption of Plaintiff's claims relating to inadequate warnings against Florence Township, however at least one court has recognized this possibility. *See e.g., Fifth Third Bank v. CSX Corp.*, 306 F. Supp.2d 841, 848-51 (N.D. Ind. 2004).  It would be inconsistent to read the federal regulations as preventing allegations of inadequate warning devices against a Railway, but to permit the same claims against the governmental entity with jurisdiction over the crossing.

not an injury to Mrs. Petre's ability to perceive oncoming danger, which – as it is alleged against the Township – is a railroad crossing. Plaintiff mistakes actual injury with defending his client's comparative negligence. Without evidence that, but for the absence of pavement markings, Mrs. Petre would have seen and responded to the other signs, the evidence is insufficient and should not be given to a jury to speculate upon. *See e.g., Cobb v. Bushey*, 152 Ohio St. 336, 345-46, 89 N.E.2d 466 (1949).

Florence Township is immune from civil liability for its alleged failure to install or maintain signs / pavement markings at the County Road I - Norfolk Southern Railway crossing. The Township's alleged misfeasance did not create a dangerous condition on the roadway which would except the Township from immunity.

### G. Multiple Proximate Causes

Plaintiff urges the Court to consider the totality of the circumstances surrounding this accident and to consider that the combination of such "robbed Mrs. Petre of having any realistic opportunity to avoid the crash," which Plaintiff contends, creates a genuine issue of material fact regarding causation. ECF Dkt. #108 at 13. Plaintiff states that all of the allegations in his complaint place Defendants in a position of owing an affirmative duty, under common law negligence doctrine, "to take reasonable steps to mitigate the dangerous situation created by their failure to satisfy their statutory duties." ECF Dkts. #108 at 21 - 22, #120 at 2 - 3. Again, this is essentially a "extra-hazardous" crossing argument, seeking to have this Court consider the totality of the circumstances existing at the crossing, or otherwise affecting the motorist, and including factors for which one or both Defendants may not be responsible. This argument is foreclosed because of federal preemption and because there is simply no evidence to reasonably

34

conclude that this crossing presented a "specific, individualized hazard" requiring mitigation by either Defendant. *See e.g.*, discussion *supra* 8 -13.

RailView and the other photographs and measurements evince that a motorist exercising ordinary care would be able to yield to an oncoming train within 50 to 15 feet (as required by R.C. §4511.62) without placing himself in a position of danger close to the railroad tracks. *See e.g., Wooten v. CSX Railroad,* 164 Ohio App.3d at 440-441, ¶¶37, 39, 40.  Additionally, to permit liability against a Railway (or governmental entity) for their engineering decisions in designing crossings and placing particular warning devices at crossings, would abrogate the Secretary of Transportation's power to set the uniform, national standards for the adequacy of the warning devices employed. *See e.g.*, *Ludwig*, 50 Fed. Appx. at 747-49.

Also, Plaintiff's argument cannot be sustained without ruling out those causes, or proximate causes, for which the defendants are not responsible.  'If the cause [of injury] may be reasonably attributed to things for which [the defendant] is not responsible as to things for which he is responsible, [the plaintiff] has not sustained his burden of proving that the alleged damages are the proximate cause of the [defendant's] negligence... .' *Herman v. Cattron, Inc*., 227 F. Supp.2d 774, 779 (N.D. Ohio 2002), *aff'd.* 94 Fed. Appx. 274, 2004 U.S. App. LEXIS 6824 (6th Cir. 2004).  Because the collision could have resulted from any one of many causes (i.e., driver distraction, unfamiliarity with the area, and any of the multitude of existing hazards present at every rural grade crossing across this country [including private property visual impediments]) Plaintiff had the burden of producing evidence that would exclude those causes for which the defendants were not legally responsible. *See e.g., Herman,* 227 F. Supp.2d at 780.  'The rule simply holds that where the facts from which an inference of probable proximate cause must be

drawn, are such that it is reasonable to infer other causes, Plaintiff has failed to supply proof of [proximate] cause.' *Id.* (internal citations omitted).

Unfortunately, no one knows what prevented Mrs. Petre from yielding to the train, or in the alternative, caused her to drive into the path of an oncoming train. Plaintiff's experts premise their theories of liability on the assumption that Mrs. Petre could neither see nor hear the train, however, to accept such theories, the jury must be able to find by a preponderance of the evidence that Mrs. Petre could not see nor hear the train by looking and listening at a point appropriate for those purposes; such a finding is impossible after viewing the RailView footage. ECF Dkt. #110 (RailView).

The duties at a railroad crossing are mutual and reciprocal. "Passive" warning devices (i.e., advanced warning sign and crossbuck signs) warn only of a railroad crossing – not necessarily of the presence of an oncoming train. The visual impediments along County Road I were intermittent and would not have completely obstructed the sight or sound of the train; there was an advance warning railroad crossing sign approximately 800 feet from the rails, and the crossbuck signs were visible from approximately 750 feet from the rails – these signs are adequate as a matter of law because of the effects of federal preemption. Mrs. Petre simply did not exercise her reciprocal duty of listening and looking for, and yielding to, an oncoming train. A reasonable jury, <u>acting without the sympathies aroused from this case</u>, could not conclude otherwise.

## IV.    **CONCLUSION**

Summary judgment for a railroad is proper where the evidence proves that a motorist using ordinary care would have seen the train. *Day v. Norfolk Southern Corp.*, 1999 U.S. App.

LEXIS 29272 at * 8 - 9 (citing *Tardy v. Norfolk Southern Corp*., 103 Ohio App.3d 372, 659 N.E.2d 817 (1995)).  The visual evidence available shows that no reasonable jury could conclude that Norfolk Southern's conduct caused or contributed to this tragic collision.  Additionally, Plaintiff's claims against Florence Township, Ohio cannot stand because of the Township's governmental immunity and the Plaintiff's failure to establish that the misfeasance of the Township created a nuisance condition on County Road I.

Therefore, the undersigned GRANTS Norfolk Southern's motion for summary judgment and DISMISSES Plaintiff's complaint against Norfolk Southern with prejudice.  The undersigned also GRANTS Florence Township's motion for summary judgment and DISMISSES Plaintiff's complaint against Florence Township with prejudice.

IT IS SO ORDERED.

SIGNED and ENTERED on this 13th day of October, 2006.


*/s/George J. Limbert*
GEORGE J. LIMBERT
United States Magistrate Judge